# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
January 11, 2011 Session

## STATE OF TENNESSEE v. TOMMY EARL JONES

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2099-CR-258      Robert E. Burch, Judge**

_____

**No. M2010-00976-CCA-R3-CD - Filed April 19, 2011**

_____

Following a jury trial, the Defendant, Tommy Earl Jones, was convicted of rape, a Class B felony, theft of property over $1,000, a Class D felony, aggravated kidnapping, a Class B felony, and especially aggravated burglary, a Class B felony. See Tenn. Code Ann. § 39-13-304(b), -13-503(b), -14-103, -14-105(3), -14-404(c). The trial court sentenced the Defendant to ten years for his rape conviction, three years for his theft conviction, ten years for his aggravated kidnapping conviction, and twelve years for his especially aggravated burglary conviction. The trial court ordered that the Defendant's sentences for rape and aggravated kidnapping be served consecutively for a total effective sentence of twenty years. In this direct appeal, the Defendant presents the following issues for our review: (1) The trial court erred when it excluded the Defendant from jury selection, trial, and the return of the verdict in the absence of any waiver; (2) The State presented insufficient evidence to convict the Defendant of especially aggravated burglary; (3) The trial court erred when it allowed a forensic expert to testify about opinions based on possibilities; and (4) The trial court erred in imposing consecutive sentences. After our review, we conclude that the Defendant's fundamental right to be present during his trial was violated. As a result, we must reverse the Defendant's convictions and remand for a new trial.

### Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Remanded

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH, J., joined. ROBERT W. WEDEMEYER, J., filed a dissenting opinion.

James Baum, Burns, Tennessee, for the appellant, Tommy Earl Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Billy Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

During the July 2009 term, a Dickson County grand jury returned a presentment alleging that the Defendant committed the offenses of rape, theft of property over $1,000, aggravated kidnapping, evading arrest, simple possession of marijuana, and especially aggravated burglary. The Defendant's trial was conducted on December 8, 2009.

The victim, J.C., testified[1] that, on April 16, 2009, after she got back home from picking her three-year-old daughter up from school, she was washing dishes in her kitchen when she felt something being sprayed in her face. She turned around and saw that a man wearing a mask was standing behind her and spraying bug spray into her face. The victim testified that she started to defend herself and was able to remove the mask from her assailant's face. When she removed the mask, she realized that the man attacking her was the Defendant, her next-door neighbor. The victim testified that, at that time, she did not know the Defendant's name, nor had she ever invited him into her home.

The victim recalled that the Defendant grabbed her arm and tried to push her into the bedroom, however, she said that she fought back and was able to prevent him from doing so. The Defendant and the victim were fighting on the floor in the hallway when the victim saw her three-year-old daughter. The victim tried to protect her daughter by covering her with the victim's right leg. The victim described that her left leg was pushed up against her chest while the Defendant was pushing her. The victim grabbed a portable heater and tried to defend herself, but the Defendant grabbed it from her and hit her in the face with it. He then wrapped the cable from the heater around her neck and tried to choke her with it. However, she testified that she was able to slip one of her hands in between the cord and her neck and eventually remove the cord. The victim was able to get up and walk toward the kitchen, but the Defendant attempted to strangle her with his hands.

While the Defendant had his hands on her neck, the victim was able to ask him what he needed and he said, "Money, money." At that point, she said that she gave him the ring she was wearing and told him that she had money in her purse. The Defendant let go of her, and the victim was able to get her purse, take out the money, and give it to the Defendant.

---

[1] The victim's testimony was in Spanish and was translated by an interpreter.

-2-

She recalled that the Defendant then asked her "something about the car keys," but she did not remember exactly what he said.

The victim recalled that, after she gave him the money, the Defendant put his hand on her breast area, tore her blouse off, and broke her bra. He threw her face down onto the ground and removed her pants. The victim testified that the Defendant got on top of her and penetrated her vagina. She recalled that she saw the Defendant ejaculate outside of her body after he had penetrated her and that she witnessed him cleaning semen off of his penis with the cup of her bra.

The victim said that, after he raped her, the Defendant tried to tie her arms and legs, but she resisted. She said that the Defendant then threatened to beat her with her wooden key rack if she did not allow him to tie her arms and legs. The victim recalled that the Defendant ultimately tied her feet together with a cable and her hands together with his shoe laces. After she was tied up, the Defendant pushed a sofa on top of her. The victim recalled that she was eventually able to free one foot and push the sofa off of her. She then ran into the kitchen and used a knife to free her hands. By this point, she recalled, the Defendant had left her house.

The victim said that, after she freed herself, she looked for her phone but could not find it. She got dressed and went outside with her daughter to look for help. Two of her neighbors were outside and they called the police upon her request. After the police arrived, she was taken to the hospital, where doctors collected vaginal samples for a rape kit. The victim stated that she spoke with police officers at the hospital and informed them that the man who attacked her was her next-door neighbor but that she did not know his name. The police officers showed her six photographs, and she identified her rapist as one of the men depicted in the photos.

The victim also testified that, when she went outside to look for help, she noticed that her red four-door Oldsmobile was missing. The victim explained that, although the car was titled in her boyfriend's name, she was the one who used the vehicle. She said that she did not give anyone permission to take the car. She also testified that, after she returned home from the hospital, she discovered that her lock-box, which was kept in her closet, had been broken into and a bag containing her jewelry was missing.

On cross-examination, the victim testified that the Defendant was dressed in black clothing when he attacked her. She said that he did not wear gloves. She also stated that, when she spoke to police on the phone after the attack, she only remembered telling them that a black man had come into her house; she did not remember whether she told them that it was her neighbor who raped her.

-3-

The victim's boyfriend testified that he lives with the victim and that they have two children together. He stated that he owns a 2000 Oldsmobile Alero, which he estimated to be worth approximately $5,000, and that he did not give anyone, other than the victim, consent to use or take the vehicle on April 16, 2009. He also testified that he had never let the Defendant use his vehicle.

Detective B.J. Gafford, with the Dickson County Sheriff's Office, testified that he responded to the victim's residence after she reported her attack. He recalled that he saw that half of a bra and an electrical cord were wrapped around one of her feet. He said that he collected those items for evidence and began photographing her home. He collected the other half of the bra, which he said appeared to have some sort of stain on it, from inside her home. He said he also collected a can of ant spray. Detective Gafford photographed the victim's door and testified that it had "the marks and appearance of forced entry being made."

Detective Gafford testified that he compiled a photo lineup and that, in his presence, the victim identified the Defendant as her attacker from the photographs. He said that he obtained DNA samples from the victim, her boyfriend, and the Defendant. On cross-examination, Detective Gaffords admitted that he never found any fingerprints of the Defendant in the victim's home, nor did he find any inside the victim's Oldsmobile Alero.

Lieutenant Andy Davis, employed by the Dickson County Sheriff's Office, testified that, at approximately 11:15 p.m. on April 17, 2009, he was called out to the Defendant's trailer, which was located next to the victim's. He said that he and other officers had information that the Defendant had returned home and they were there to serve arrest warrants on him. Lieutenant Davis recalled that they knocked on the door and announced that it was the sheriff's office, however, the Defendant did not answer. He said that the officers then made a forced entry. Lieutenant Davis testified that the officers did not immediately find the Defendant, but eventually located him hiding inside an air vent and took him into custody. Lieutenant Davis then proceeded to a nearby storage facility, where the victim's missing vehicle was located. He said that he dusted the car for fingerprints and lifted two prints from the driver's door.

Special Agent Mike Turbeville, who was certified an expert by the trial court, testified that he works as a forensic scientist for the Tennessee Bureau of Investigation. He testified that he analyzed the victim's rape kit and discovered that the victim's vaginal swabs contained sperm cells. He testified that further DNA analysis revealed that the sperm cells

were from the victim's boyfriend.[2]  Special Agent Turbeville also tested the portion of the victim's bra that was recovered from her home and testified that the DNA profile of semen found on it was a match to the Defendant.  He stated that the probability of someone else having the same DNA profile as the Defendant exceeded the world's population.  Special Agent Turbeville also analyzed the Defendant's dark blue tee-shirt and found sperm cells and non-sperm cells on the bottom of it.  He testified that the DNA profile of the sperm cells matched the victim's boyfriend and the DNA profile of the non-sperm cells matched the victim.

Special Agent Susanne Lafferty, a forensic scientist with the Tennessee Bureau of Investigation, was certified as an expert by the trial court.  She testified that she examined a can of ant spray and the fingerprints lifted from the victim's vehicle.  On the can of ant spray, she found an identifiable latent fingerprint and an identifiable palm print.  She testified that she compared the Defendant's fingerprints to the one identified on the can, but that the Defendant's fingerprints did not match.  Special Agent Lafferty also said that she did not receive a reference copy of the Defendant's palm print and, therefore, could not determine whether or not his palm print matched the one she recovered from the can.  Regarding the prints recovered from the driver's door of the victim's car, Special Agent Lafferty testified that they matched the Defendant's fingerprints from his left middle and left ring fingers.

At the close of the State's proof and upon the Defendant's motion for judgment of acquittal, the trial court dismissed count four, evading arrest, and count five, simple possession of marijuana.  The Defendant presented no proof.

The jury found the Defendant guilty of rape, theft of property over $1,000, aggravated kidnapping, and especially aggravated burglary.  The trial court sentenced the Defendant to ten years for his rape conviction, three years for his theft conviction, ten years for his aggravated kidnapping conviction, and twelve years for his especially aggravated burglary conviction.  The trial court ordered that the Defendant's sentences for rape and aggravated kidnapping be served consecutively for a total effective sentence of twenty years.  The Defendant now appeals.

**Analysis**

The Defendant presents the following issues for our review: (1) The trial court erred when it excluded the Defendant from jury selection, trial, and the return of the verdict in the absence of any waiver; (2) The State presented insufficient evidence to convict the Defendant

---

[2]  The victim testified that she had engaged in sexual relations with her boyfriend the night before she was raped.

of especially aggravated burglary; (3) The trial court erred when it allowed a forensic expert to testify about opinions based on possibilities; and (4) The trial court erred in imposing consecutive sentences.

## I. Defendant's Exclusion from his Trial

At the beginning of the Defendant's trial, before voir dire had begun, the Defendant's attorney informed the trial court that the Defendant raised an issue that the court should hear without potential jurors in the courtroom. The trial court asked the potential jurors to leave the courtroom and the following transpired:

> [Defense Counsel]: . . . Earlier I was talking to Mr. Jones and he informed me that he was unhappy with my representation. That he believes that we have irreconcilable differences and he would like to move the [c]ourt to get a different attorney.
>
> [Trial Court]: Are you appointed?
>
> [Defense Counsel]: I was appointed, Your Honor.
>
> [Trial Court]: Mr. Jones, if you hire an attorney you pick them. If I appoint them I pick them. Have a seat, we're starting the trial.
>
> Bring the jury in.
>
> (Whereupon the potential jury returned to the courtroom.)
>
> [The Defendant]: Excuse me, sir?
>
> [Trial Court]: What?
>
> [The Defendant]: I would—I would like another—
>
> [Trial Court]: Stand up when you talk to me.
>
> [The Defendant]: I would like another attorney.
>
> [Trial Court]: I denied that.
>
> [The Defendant]: I'm not going—

[Trial Court]:  Sit down and be quiet.

[The Defendant]:  I don't want to pay for it.

[Trial Court]:  Sit down.

[Court Officer]:  He denied it.

[Trial Court]:  Be quiet.

[Court Officer]:  He denied it, sit down.

[The Defendant]: I will sit down.  I don't want to pay, sir.  I would like another—I know my rights.  I do not—

[Trial Court]:  Ladies and gentlemen, will you go out in the jury room—or outside, please?

(Whereupon the potential jury exited the courtroom.)

[The Defendant]: I will get a contempt.  I do not want my case lawyer. I want another attorney.  I know my rights.  My friend is a judge, okay.  I have a [sic] appointed—that's court appointed judge.  I know my rights.

[Trial Court]:  Stand up when you talk to me.

[The Defendant]:  I will.

[Trial Court]:  You be quiet and I'm going to talk to you.

[The Defendant]:  Thank you very much sir.

[Trial Court]:  Now, I have denied your motion, that means no, it ain't going to happen.  If you keep talking, I'm going to duck tape your mouth shut and shackle you to that chair.  Now, do you understand that?

[The Defendant]:  Sir, the Supreme Court will hear it.  I will have a problem with that.  I do not want this man as my counsel.

[Trial Court]:  I don't care if you want him or not.

[The Defendant]: And all this will be documented to the Supreme Court. You can duck tape me. They can chain me, sir.

[Trial Court]: You can document it all you want to.

[The Defendant]: I do not want this man representing me.

[Trial Court]: Well, I appointed him.

[The Defendant]: And I will not stand court here, because I do not want him as my attorney. I know—I'm not scared, sir. I know my rights. I do not want Mr. Baum as my attorney.

[Trial Court]: Okay.

[The Defendant]: You can duck tape me, you can chain me. I'm not being heard. God is my witness.

[Trial Court]: Have a seat and be quiet.

[The Defendant]: So when you're ready to take me back to jail—

[Trial Court]: Be quiet. You've had your say now. You speak when you're spoken to.

All right. Bring the jury in.

[The Defendant]: Sir, can I stand up and talk about my attorney?

[Trial Court]: Be quiet. Now, I'm going to bring the jury in here and I'm going to get real upset if you start showing out in front of the jury.

[The Defendant]: I'm not showing out, sir. I do not want Mr. Baum as my attorney.

[Trial Court]: Well, I've already resolved that. He's going to be your attorney. We're moving ahead.

[The Defendant]: I know my rights, sir.

[Trial Court]: I'm glad you do.

[The Defendant]: And this will be going on all day. They can shoot me. They can beat me. You can do whatever you ordinarily do. Mr. Baum is not representing me today as my attorney.

[Trial Court]: Well, I say he is.

[The Defendant]: Not me, sir. You can get the duck tape ready. They can do whatever they want to do. Mr. Baum is not representing me. This case is put together. I didn't do nothing to nobody. That man, sitting right there, Detective Gafford had put this whole case together. I get put on a rape scene—

[Prosecutor]: Your Honor, I would like to make a motion that he be excluded. He's got a right to be here, and if he's going to be this disruptive all the way through this trial, the law in Tennessee is we can exclude him from the courtroom and try it without him.

[Trial Court]: Take him and put him in the holding cell. We're going to start the trial. We'll tell you how it comes out.

At that point, the Defendant was removed from the courtroom and remained absent during the entire jury voir dire. After a jury had been selected, the trial court brought the Defendant back into the courtroom and the following transpired:

[Trial Court]: Mr. Jones, I have brought you back in the courtroom. The jury has been selected. This trial is going ahead. You're [sic] only choice is to whether you want to join us or not.

Now, you know, if you'll behave and sit there quietly, and observe the proceedings, and so forth, you know, talk with your lawyer and so forth, you are welcome to stay. But if you choose not to do that, then I'm going to exclude you from the courtroom and we're going to go ahead with it.

Now, which do you want to do?

[The Defendant]: Well, this started without me, Your Honor, and I would rather take my chance in the Supreme Court, and let you go [sic] all go on with your proceeding and what you decided to do.

-9-

[Trial Court]: I'm sorry, you said that you're going to take your chances?

[The Defendant]: Whatever you do here today, you all got your own mind. Because to me, this ain't no justice, I don't know what this is.

[Trial Court]: Well, you understand that if you're not here the jury is liable to take an adverse inference from that?

[The Defendant]: If—really, what the jury is supposed to do about me not being here is to throw it out, because I'm supposed to pick 12 of those jurors, sir. That is the defense. He's supposed to pick six and I'm supposed to pick six by law.

[Trial Court]: Well, that's—

[The Defendant]: Like I said, sir, I'm—I—I have a high school diploma. I'm a certified truck driver and I'm a certified forklift operator. I'm not going to go—I'm—I'm—here, I have a hole in my body. I've been over there in the jail for seven months. No help. I'm hurting right now. I have to stay up until three or four o'clock in the morning, because I can't sleep because I'm in pain. Nobody do nothing.

So what you do here today, sir, like I explained to my lawyer, if they give me a hundred years out here today, that's what they will do.

But the Supreme Court will gladly hear it. It's a man in my eyesight that's a bunch of racists. And it's put together and nobody took no initiative to look into this to see what happened.

I came from my home from Nashville, Tennessee. I go in my house. These people that are supposed to be the victims they see me go in my house. They ain't calling nobody, sir. Somebody across the street calls, seeing me going in my house. These people know it.

I look at all this stuff they got, all the county reports. My name ain't no where in this. I'm not on the news. I'm not no where. My name ain't no where on the 16th, but somebody—somebody—they want my kids. They put me at the crime of the scene [sic].

Somebody gave final temporary custody. I didn't gave nobody permission to oversee my kids.

I don't know if it was put together. Nobody concerned. Take the blame out on him. Do what you want to do. Put it together, go ahead, but I'm not going to be part of it. I wasn't a part of this from the jail.

[Trial Court]: All right. I understand that you do not choose to stay for your trial?

[The Defendant]: I didn't even pick the trial, sir. I don't even—I don't even have counsel. And if Mr. Baum, if he could, just get up and walk out and he say he don't want to represent me. I would appreciate if you would do that and we wouldn't have to be going through this right here. I can have another counsel.

This man is—this appointed counsel saw me Tuesday for 10 minutes. I didn't even know I was having a trial today.

[Trial Court]: All right.

[The Defendant]: No hospital reports said anything.

[Trial Court]: All right. Take the Defendant out.

At that time, the Defendant was removed from the courtroom, the jury was brought in, the indictment was read, opening arguments were conducted, and the State presented its proof. After the State had rested its case, the Defendant was brought back into the courtroom for a Momon hearing. See Momon v. State, 18 S.W.3d 152, 162 (Tenn. 1999). The trial court then asked the Defendant if he wanted to stay and watch the rest of the trial, but the Defendant declined to do so. The Defendant was not present in the courtroom when the jury returned its verdict.

The Defendant contends that the trial court committed reversible error when it excluded him from the courtroom without following the procedures detailed in Rule 43 of the Tennessee Rules of Criminal Procedure. We must agree.

"A defendant has a fundamental right under both the federal and state constitutions to be present during his trial." State v. Mosley, 200 S.W.3d 624, 631 (Tenn. Crim. App. 2005); see also State v. Muse, 967 S.W.2d 764, 766 (Tenn. 1998) (discussing the various

-11-

sources that this right is derived from). "Presence at 'trial' means that the defendant must be 'present in court from the beginning of the impaneling of the jury until the reception of the verdict and the discharge of the jury.'" <u>Muse</u>, 967 S.W.2d at 766 (quoting <u>Logan v. State</u>, 173 S.W. 443, 444 (Tenn. 1915)). In <u>Muse</u>, our supreme court held that defendants have "a constitutional right, as well as a Rule 43(a) right, to be present at voir dire." <u>Id.</u> at 767. The court further explained that "[t]here is a constitutional right because the presence of the defendant during jury selection had a reasonably substantial relation to his opportunity to defend against the charge." <u>Id.</u>

In addition to the rights guaranteed by the federal and state constitutions, Rule 43(a)(2) of the Tennessee Rules of Criminal Procedure states that "the defendant shall be present at . . . every stage of the trial including the impaneling of the jury and the return of the verdict." Rule 43 also provides as follows:

> **(b) Continued Presence Not Required.** The further progress of the trial, to and including the return of the verdict and imposition of sentence, shall not be prevented and the defendant shall be considered to have waived the right to be present whenever a defendant, initially present:
>
> **(1) Voluntary Absence.** Voluntarily is absent after the trial has commenced, whether or not he or she has been informed by the court of the obligation to remain during the trial; or
>
> **(2) Disruptive Conduct.** After being warned by the court that disruptive conduct will result in removal from the courtroom, persists in conduct justifying exclusion from the courtroom.
>
> **(c) Procedure After Voluntary Absence or Removal.**
>
> **(1) Representation by Counsel.** If a trial proceeds in the voluntary absence of the defendant or after the defendant's removal from the courtroom, he or she must be represented in court by counsel.
>
> **(2) Disruptive Conduct.** If the defendant is removed from the courtroom for disruptive behavior under Rule 43(b)(2):
>
> **(A) Access to Counsel After Removal.** The defendant shall be given reasonable opportunity to communicate with counsel during the trial; and

**(B) Periodic Review of Removal.** The court shall determine at reasonable intervals whether the defendant indicates a willingness to avoid creating a disturbance if allowed to return to the courtroom. The court shall permit the defendant to return when the defendant so signifies and the court reasonably believes the defendant.

Finally, a defendant's right to be present during jury selection is so basic to a fair trial that infraction of that right will not be treated as harmless. Muse, 967 S.W.2d at 768. We note that this Court has repeatedly held that automatic reversal is required when a defendant's constitutional and statutory rights to be present at his trial have been violated. See State v. Far, 51 S.W.3d 222, 227-28 (Tenn. Crim. App. 2001); State v. Ballard, 21 S.W.3d 258, 262 (Tenn. Crim. App. 2000).

Turning to the instant case, we first address the State's argument that the Defendant waived this issue by failing to raise a contemporaneous objection when the State made a motion to exclude the Defendant. We do not agree.

In Muse, our supreme court explained as follows:

There is a long-standing presumption against waiver of fundamental constitutional rights. See Johnson v. Zerbst, 304 U.S. 458, 464 (1938). The relinquishment of a fundamental constitutional right may only be waived personally by the defendant and will not be presumed from a silent record. House v. State, 911 S.W.2d 705, 714 n.20 (Tenn. 1995). In order to waive the right to be present for voir dire, a defendant must have knowledge of the right and, before voir dire is conducted, must personally waive the right either in writing or on-the-record in open court.

967 S.W.2d at 767-68.

The Defendant continued to protest being represented by his counsel when the State made a motion for him to be removed and the trial court granted the motion. After examining the record, we conclude that the Defendant did not personally waive his right to be present for voir dire. Therefore, we reject the State's argument that the Defendant waived this issue when he failed to object to his removal.

In order to determine whether the trial court's actions complied with Rule 43, we must determine whether the Defendant was absent voluntarily or whether his disruptive conduct caused his absence. After reviewing the dialogue that occurred before the Defendant was initially removed, we find that it is clear the Defendant was removed for his disruptive

conduct. In fact, the State even described the Defendant's behavior as "disruptive" when requesting that he be removed from the courtroom. Cf. State v. Charles D. Mullins, No. 01C01-9709-CC-00388, 1999 WL 228819, at *14 (Tenn. Crim. App., Nashville, Apr. 21, 1999) (affirming the decision of the trial court that the defendant, who was absent when the jury returned its verdict, was voluntarily absent because he was hospitalized due to an overdose of prescription drugs); State v. Tidmore, 604 S.W.2d 879, 880-81 (Tenn. Crim. App. 1980) (affirming the trial court's determination that the defendant was voluntary absent when, because of threats made against his life, he failed to appear after the weekend recess).

Thus, per Rule 43(b)(2) of the Tennessee Rules of Criminal Procedure, before removing the Defendant for disruptive conduct, the trial court was required to warn him that, if he continued to engage in such conduct, he could be excluded from the courtroom. The State argues that the trial court gave the required warning when it told the Defendant, "If you keep talking, I'm going to duck tape your mouth shut and shackle you to that chair." However, such a threat falls short of the required warning prescribed by Rule 43(b)(2) because the Defendant was not warned that he could be excluded from his own trial. Therefore, because the record reveals that the trial court removed the Defendant from his trial without first warning him that he could be excluded if he persisted in disruptive behavior, we find that reversible error was committed and remand for a new trial.

Although our resolution of the foregoing issue is dispositive, in order to facilitate possible further appellate review, we will now address the remaining issues that the Defendant presents. See State v. Pendergrass, 13 S.W.3d 389, 395 (Tenn. Crim. App. 1999).

## II. Sufficiency of the Evidence

The Defendant argues that the evidence presented at trial is insufficient to support his conviction for especially aggravated burglary beyond a reasonable doubt. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

"A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building and commits or attempts to commit a felony, theft or assault." See Tenn. Code Ann. § 39-14-402(a)(3). Aggravated burglary is defined as "burglary of a habitation." See Tenn. Code Ann. § 39-14-403(a). Tennessee Code Annotated section 39-14-404(a) states, "Especially aggravated burglary is: (1) Burglary of a habitation or building other than a habitation; and (2) Where the victim suffers serious bodily injury." "'Serious bodily injury' means bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34).

The Defendant argues that the injuries the victim sustained do not constitute serious bodily injury. The State argues that the victim suffered "extreme physical pain" and that the evidence was sufficient to support the Defendant's conviction. After reviewing the evidence presented regarding the extent of the victim's injuries, we must agree with the Defendant that the evidence was insufficient to support his conviction for especially aggravated burglary.

In State v. Sims, the victim received a broken nose, a laceration across the bridge of her nose, a bruised cheekbone from a blow to her face, and two black eyes. 909 S.W.2d 46, 48 (Tenn. Crim. App. 1995). This Court noted that "[t]he victim also testified that she missed five weeks of work and experienced extreme physical pain over her whole face, but especially to her nose." Id. When determining whether the victim's injuries constituted serious bodily injury, this Court stated as follows:

> The *ejusdem generis* canon of statutory construction is helpful when construing the enumerated definition of "serious bodily injury." According to the Sixth Edition of Black's Law Dictionary, *ejusdem generis* means when words follow an enumeration of classes of things the words should be construed to apply to things of the same general class as those enumerated.

Therefore, the enumerated portions of the definition of serious bodily injury should be read as coming from the same class of injuries. We do not believe that the pain commonly associated with a broken nose is extreme enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty. We admit to the difficulty of quantifying or measuring pain.

. . . .

We conclude that there is insufficient evidence to support serious bodily injury and therefore an especially aggravated robbery conviction. We conclude that the conviction must be modified to aggravated robbery.

Id. at 49-50; see also Lyons v. Rasar, 872 S.W.2d 895, 897 (Tenn. 1994) ("[A]nother aid to determining legislative intent is the rule 'ejusdem generis,' meaning where general words follow special words which limit the scope of the statute, general words will be construed as applying to things of the same kind or class as those indicated by the preceding special words."). In State v. Barnes, this Court found that an assault victim who received "several knots on the back of the head and bruises on the back caused by the 'stick,' a burn on the victim's nose from a light bulb, and a single bite on the arm" did not suffer serious bodily injury as defined by the statute. 954 S.W.2d 760, 766 (Tenn. Crim. App. 1997); see also State v. Arnett, 49 S.W.3d 250, 263-64 (Tenn. 2001) (finding that a rape victim who sustained bumps, bruises, and cuts to her legs did not suffer serious bodily injury).

In the instant case, despite the prosecutor's many inquiries into the victim's level of pain after the attack, the victim only testified that she was in "a lot of pain." She further described her injuries as follows:

[M]y eyes were red from what spray had been put on my face and I had some places on my face . . . where I had been hit. There was also places on my arm where I had been hit, and I had marks on my wrist where I . . . had been tied, and then a few scratches on—on my chest when he stuck his hand there, and my stomach was—was hurting.

No other proof was presented regarding the extent of the victim's injuries. We conclude that the State presented insufficient evidence to sustain the Defendant's conviction for especially aggravated burglary because the victim's testimony regarding her injuries does not indicate that she suffered "extreme physical pain" as envisioned by the statutory definition of "serious bodily injury." See Tenn. Code Ann. § 39-11-106(a)(34). Were we not already reversing the

-16-

Defendant's convictions, we would reverse the Defendant's especially aggravated burglary conviction, modify the judgment to reflect a conviction for aggravated burglary and remand to the trial court for resentencing.

## III. Expert Testimony

The Defendant contends that the trial court improperly allowed Special Agent Turbeville to speculate: (1) How bodily fluids from the victim and her boyfriend got on the Defendant's shirt and (2) Whether it was possible to have vaginal penetration with a penis but detect no DNA from the penis on the victim's vaginal swabs.

During Special Agent Turbeville's testimony, the following occurred:

[Prosecutor]: Would you have an explanation on how—an explanation as to how [the victim's boyfriend and the victim's] body fluids got on Tommy Earl Jones' shirt?

[Defense Counsel]: I want to object, Your Honor. I think that calls for speculation.

[Trial Court]: Well, scientist [sic] can make speculations.

Ladies and gentlemen, you will be told about how to receive expert testimony. An expert can give an opinion. It's up to you to give the weight to that opinion.

[Witness]: My best guess would be that somehow that shirt came in contact with her vaginal area and a wet semen stain got transferred to that shirt.

[Prosecutor]: Would that be, in your opinion, Agent Turbeville, the most likely scenario?

[Witness]: Yes, sir.

[Prosecutor]: Okay. And that would be contact—that shirt would had contact with her vaginal [sic], which we know contained [the victim's boyfriend's] semen and obviously her own fluids?

[Witness]: Yes, it had to have been wet to transfer like that.

Later in Special Agent Turbeville's testimony, the Defendant again objected to a question posed by the prosecutor:

> [Prosecutor]: Special Agent Turbeville, is it possible to have vaginal penetration of a penis and there not be D.N.A. material on the vaginal swab?
>
> [Defense Counsel]: I would object, Your Honor. That calls for speculation as a possibility. Anything is possible.
>
> [Trial Court]: Well, that would be a scientific possibility. That's something an expert can give, overruled.
>
> [Witness]: Could you repeat the question?
>
> [Prosecutor]: Is it—is it possible for—for there to be vaginal penetration with a penis and there be no transfer of D.N.A. material from the penis?
>
> . . . .
>
> [Witness]: Well, that's possible that maybe a trace amount of D.N.A. was left and—and there was such a small amount that I was not able to pick it up.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. Rule 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 further provides as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their

prejudicial effect. T he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

This Court has stated that "[t]he allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Davis, 872 S.W.2d 950, 954 (Tenn. Crim. App. 1993).  We will not reverse the trial court's decision "absent a clear showing of abuse of discretion."  Id.; see State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002). This Court will not find an abuse of discretion unless "it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining."  State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

Upon reviewing the record, we cannot conclude that the trial court abused its discretion.  Special Agent Turbeville's testimony regarding the presence of DNA from the victim and her boyfriend on the Defendant's shirt was an inference based on his knowledge of the facts of the case.  The victim testified that she had sexual relations with her boyfriend the night before she was raped.  Special Agent Turbeville testified that, other than the victim's DNA, he only found DNA from the victim's boyfriend on the swabs contained in the rape kit.  Thus, Special Agent Turbeville used his knowledge of forensic science to assist the trier of fact in understanding how the victim's boyfriend's DNA could have been transferred to the Defendant's shirt.  Similarly, Special Agent Turbeville's testimony that it was possible trace amounts of DNA were not detected in his testing assisted the trier of fact in understanding the evidence.  The Defendant is not entitled to relief on this issue.

## IV.  Consecutive Sentencing
The trial court ordered that the Defendant's sentences for rape and aggravated kidnapping be served consecutively for a total effective sentence of twenty years.  The Defendant contends that the trial court erred in imposing consecutive sentences.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous.  See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct.  Tenn. Code Ann. § 40-35-401(d).  However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also

State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim

or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentences. The trial court found that criteria (4) applied to the Defendant.

Regarding the imposition of consecutive sentences because the defendant is a dangerous offender, our supreme court has held, "The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

When the trial court imposed consecutive sentences on the Defendant, it only stated as follows:

The [c]ourt orders Count I and Count III, the rape and the aggravated kidnapping, to be served consecutively to each other, the other two to be served concurrent with Count I.

The [c]ourt find this Defendant is a dangerous offender, who has no hesitation about committing a crime in which the risk to human life is high, and finds that consecutive sentencing is appropriate.

Thus, the trial court failed to find that consecutive sentences were "reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender," as required by Wilkerson. See id. Were we not reversing the Defendant's convictions, we would remand for resentencing pursuant to the principles recognized in Wilkerson.

## Conclusion

Based on the foregoing authorities and reasoning, we conclude that the Defendant's fundamental right to be present during his trial was violated and, therefore, we must reverse his convictions and remand for a new trial. Regarding Count VI, as we have found that the

State presented insufficient evidence to convict the Defendant of especially aggravated burglary, the State cannot retry the Defendant for especially aggravated burglary but can proceed on the lesser charge of aggravated burglary.

_____
DAVID H. WELLES, JUDGE